# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| CLINTON S., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:17-cv-1492 |
| v. | ) | |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

# <u>ORDER & OPINION</u>

This matter is an appeal from the Administrative Law Judge's decision to deny the request of Plaintiff Clinton S. for disability benefits under the Social Security Act. Before the Court is Plaintiff's Motion for Summary Judgment (Doc. 10) and the Defendant Acting Commissioner Nancy Berryhill's Motion for Summary Affirmance (Doc. 14). For the following reasons, Plaintiff's motion is DENIED, and Defendant's motion is GRANTED.

## PROCEDURAL BACKGROUND

In December 2013, Plaintiff filed an application under Title II and Title XVIII for a period of disability and disability insurance benefits and an application under Title XVI for supplemental security income (SSI). (R. at 210-15).[1] In both applications, Plaintiff alleged his disability began on October 1, 2013. (R. at 210). The Social Security Administration initially denied Plaintiff's application and did so again

---

[1] Citation to "R. at ___" refers to the page in the certified transcript of the record of proceedings provided by the Social Security Administration.

on reconsideration in March 2015. (R. at 18; Exs. 2A, 3A). In May 2015, Plaintiff requested a hearing before an administrative law judge (ALJ). (R. at 18; Exs. 6A, 7A). In November 2016, the ALJ held a hearing where Plaintiff, who was represented by an attorney, and a Vocational Expert (VE) testified. (R. at 37-77).

On February 13, 2017, the ALJ issued a decision concluding Plaintiff was not disabled and was therefore ineligible for disability benefits. (R. at 18-29). On August 31, 2017, the Social Security Administration Appeals Council denied Plaintiff's request to review the ALJ's decision. (R. at 1-3). In doing so, it rendered the ALJ's decision final. Plaintiff thereafter filed the instant Complaint (Doc. 1) on November 3, 2017.

### FACTUAL AND MEDICAL HISTORY

The following is a detailed summary of Plaintiff's medical and mental health records submitted to the ALJ for consideration. In 2010, Plaintiff sought treatment at Tazwood Mental Health Center but was ultimately discharged due to his failure to keep appointments and follow the treatment plan. (R. Ex. 3F; R. at 20, 484).

In February 2011, Plaintiff underwent a medical examination, during which he reported bipolar disorder, anxiety, post-traumatic stress disorder, headaches, and shortness of breath with exertion. (R. at 485). Plaintiff also reported he smokes two packs of cigarettes per day. (R. at 486). The examination revealed a respiratory rate of 14 and normal lung functioning. (R. at 486-87). The physician noted Plaintiff had no functional capacity limitations, specifically no walking or squatting limitations. (R. at 487). In addition, Plaintiff was rated "appropriate" for appearance, personal hygiene, concentration, ability to relate, behavior, and conversation, though he was

rated slightly inappropriate for "orientation to time" because he "doesn't keep up to date." (R. at 490).

He also underwent a psychological evaluation in February 2011. Plaintiff reported he began using cocaine at the age of fourteen and stated he was a social drinker. (R. at 491-92). At the age of sixteen or seventeen, he was allegedly admitted to a psychiatric hospital and has since had two additional psychiatric hospitalizations.[2] (R. at 492). Plaintiff reported a criminal history including burglary, grand theft auto, and cashing stolen checks; Plaintiff stated he spent forty-three months in prison, during which he was violent, resulting in time spent in solitary confinement and psychiatric care following a threat of suicide. (R. at 491-92). Plaintiff further stated he attempted suicide by swallowing chlorine but reported no resulting damage to his throat. (R. at 492). During this evaluation, Plaintiff stated he was a certified nursing assistant (CNA) for five years but lost his license due to his criminal record; he then worked in sales and as a gas station attendant but lost those jobs because he either did not get along with others or would show up late. (R. at 491). Plaintiff reported he does his own cleaning and cooking despite living with his parents. (R. at 492). With respect to his mental health, Plaintiff reported depression, excess sleep, crying spells, and irritability. (R. at 492).

The psychologist believed Plaintiff would test in the "borderline range of intellectual functioning." (R. at 493). During the evaluation, Plaintiff was able to do simple calculations and tasks; he was oriented to time, place, and person and his long-term memory was intact but his short-term memory was moderately impaired. (R. at

---

[2] The record does not contain any records of psychiatric hospitalizations.

493). The psychologist specifically noted Plaintiff seemed to exaggerate a great deal. (R. at 493).

In March 2011, physical and mental residual functioning capacity (RFC) assessments were completed in conjunction with an application for disability insurance benefits. (Exs. 8F, 9F, 10F). With respect to his physical RFC, Plaintiff alleged in his application he could only walk 50 feet before experiencing shortness of breath and he had difficulty lifting, bending, and climbing as well as a history of headaches. (R. at 494, 499). The agency physician noted a history of coronary artery disease (CAD) and mild lymphadenitis but also a normal pulse and cardio exam, clear lungs, and normal range of movement and gait. (R. at 495). The physician opined Plaintiff could perform medium work (frequently lift 25 pounds, occasionally lift 50 pounds, and stand, walk, or sit for approximately 6 hours in an 8-hour workday) (R. at 495). *See also* C.F.R. § 404.1567(c). The physician did, however, recommend Plaintiff avoid extreme cold and heat as well as "hazards." (R. at 498). The physician believed Plaintiff's reported symptoms and limitations were only partially credible based on the objective medical history. (R. at 499).

With respect to his mental RFC, the agency consultant concluded Plaintiff was mildly limited in his daily living activities and moderately limited in his social functioning abilities and his ability to maintain concentration, persistence, and pace. (R. at 512). Notably, the consultant found no limitations with Plaintiff's understanding or memory or his ability to adapt. (R. at 516-17). The consultant noted Plaintiff was organized, easy to understand, and focused and noted no difficulties with the examination/claim process. (R. at 514). Specifically, the consultant opined

Plaintiff had the ability to "understand, carry out, and remember moderately complex instructions." (R. at 518). "He is capable of making work-related decisions and judgments. He can relate appropriately to supervisors, coworkers, and work situations, but would work best in a lowered stress environment, away from the general public. He is able to cope with changes in a routine work setting." (R. at 518). In addition, the consultant concluded Plaintiff can perform daily life activities. (R. at 518). Plaintiff reported he cleans, cooks, and visits a friend, but both he and his mother also reported he drives, is unmotivated, rarely cooks, shops excessively, and is irresponsible with money. (R. at 514). Based on the evidence in the record, the consultant found Plaintiff only partially credible. (R. at 514).

In March 2012, Plaintiff went to the emergency room, claiming he received a false positive tuberculosis test result. (R. at 592). During intake, Plaintiff reported no alcohol or drug use. (R. at 592) He was also asked whether he (1) felt depressed, (2) had suicidal thoughts, or (3) had previously attempted suicide; Plaintiff answered no to all. (R. at 592-93). In July 2012, Plaintiff went to the hospital because his ankle was sore after he stepped out of his truck and landed on his heel incorrectly. (R. at 580). Plaintiff also reported chest pains and difficulty breathing, but examination revealed normal cardiac and lung functioning. (R. at 581). During intake, Plaintiff reported no alcohol or drug use and good social support. (R. at 581). He was again asked whether he (1) felt depressed, (2) had suicidal thoughts, or (3) had previously attempted suicide; Plaintiff again answered no to all. (R. at 584). Plaintiff was diagnosed with tendonitis and instructed to ice and elevate his ankle; he was also given pain medication. (R. at 582). In April 2013, Plaintiff was taken to the hospital

by ambulance complaining of chest pains and a possible heart attack; during intake, Plaintiff also reported he fell down the stairs and hit his head earlier that day. (R. at 557, 571). Examinations revealed normal heart and lung functioning. (R. at 557, 560, 562, 571). During intake, Plaintiff was once more asked whether he (1) felt depressed, (2) had suicidal thoughts, or (3) had previously attempted suicide, and he again answered no to all. (R. at 571). The examining physician determined Plaintiff was stable and discharged him the same day. (R. at 568).

In January 2014, Plaintiff returned to Tazwood for mental health treatment. In his intake assessment, he reported anxiety, depressed mood, irritability, impulsivity, and racing thoughts. (R. at 521-23). Plaintiff also reported past cocaine abuse and social use of alcohol. (R. at 526). Plaintiff stated he was unemployed due to his reported symptoms, specifically because he would get frustrated, bored, or go on a drug binge and fail to show up for work. (R. at 529). Plaintiff reported he was in good physical health excepting an irregular heartbeat. (R. at 532). Plaintiff was discharged from Tazwood in February 2014 for failing to show up to appointments or follow the treatment plan. (R. at 605).

In February 2014, Plaintiff sought mental health treatment at North Central Behavioral Health Systems because he no longer wanted to drive to Tazwood for treatment. (R. at 719). During his intake assessment, Plaintiff reported his ability to perform daily living activities, such as cooking and grooming, had decreased over time. (R. at 726). He also reported changes in appetite, distraction, paranoia, racing thoughts, and decreased need for sleep, all of which the provider believed consistent with his bipolar disorder diagnosis. (R. at 726). Plaintiff indicated past suicidal

thoughts but denied ever having the intent or a plan to commit suicide, excepting one suicide attempt at the age of 17; Plaintiff was not considered a risk to his own safety. (R. at 719, 732). The examiner noted appropriate expressions and dress and intact recent and remote memory. (R. at 729). Largely similar observations were made in subsequent, periodic assessments. (R. at 950-61, 968-73; 981-86; 992-1013; 1019-25).

Plaintiff also underwent a stress test in February 2014. During his visit with the examining physician, Plaintiff described episodes in which he felt numb, sweaty, and dizzy; he believed might have passed out during some of these episodes. (R. at 600). He stated his mother witnessed him passing out but did not take him to the emergency room or otherwise seek emergency assistance. (R. at 600). The physician noted normal cardiac and lung functioning and recommended Plaintiff quit smoking. (R. at 599-600).

In March 2014, a Pulmonary Function Study revealed a moderately severe restrictive pulmonary defect, and Plaintiff was thereafter referred to a pulmonologist. (R. at 692). Plaintiff also underwent physical and mental health examinations. (R. at Ex. 16F). During his physical exam, Plaintiff reported heart issues and shortness of breath, chest pains, a "5mm spot on his left lung", and an irregular heartbeat. (R. at 642). Plaintiff also reported a history of chronic obstructive pulmonary disease (COPD) and five previous heart attacks.[3] (R. at 642). Plaintiff indicated he underwent a stress test and cardiac catherization, and the stress test came back negative. (R. at 642; *see also* 696 (noting the stress test results were negative)). The physician indicated Plaintiff was able to bear weight and had a full range of motion. (R. at 644).

---

[3] The record does not reveal any prior heart attacks.

In addition, the physician noted normal cardiac and lung functioning and questioned Plaintiff's reported history of COPD but also noted Plaintiff had been referred to a pulmonologist for his allegations of shortness of breath. (R. at 644-45).

During his mental health exam, Plaintiff reported agitation, irritation, paranoia, and suicidal thoughts and prior diagnoses of depression, bipolar disorder, and split personality disorder. (R. at 647). Plaintiff stated he was meeting with a counselor at Tazwood once a week. (R. at 647). Plaintiff reported he lived with his parents and had no issues eating or grooming; he also stated he would make himself a sandwich for his sole daily meal and would only shower once every three days because he was unmotivated. (R. at 648). According to Plaintiff, he spent his days sitting, watching TV, and playing computer games. (R. at 648). The consultant observed Plaintiff was neat and clean in appearance and exhibited appropriate expressions, behavior, and eye contact during the interview. (R. at 649). Plaintiff exhibited no difficulties walking or sitting during the examination. (R. at 649). He was able to perform simple calculations and could complete serial sevens, and his immediate memory was intact but his short-term memory was impaired, likely due to his difficulties with concentration. (R. at 649). The consultant rated Plaintiff within the low average range for intellectual functioning and agreed with his reported diagnosis of bipolar disorder based on the information reported by Plaintiff. (R. at 649-50).

In June 2014, North Central received records from Tazwood, which indicated Plaintiff's symptoms were well-controlled by his prescribed medications. (R. at 741). In October 2014, North Central treatment notes indicated his symptoms had

improved and he was doing well. (R. at 761). The treatment notes also significantly focused on Plaintiff's ability and plans to cope with his reported lung cancer and chemotherapy. (R. at 714-18, 944-45, 967, 977, 988-89, 1018). There is no evidence in the record indicating Plaintiff has ever been diagnosed with cancer or undergone chemotherapy, which was noted in the RFC report generated by the agency consultants in conjunction with Plaintiff's instant application for disability benefits. (R. at 113). In July 2015, Plaintiff was discharged from North Central because he failed to follow through with the treatment plan. (R. at 1028-32).

Plaintiff returned to North Central in November 2015. During his intake, he reported manic episodes, mood swings, suicidal thoughts, irritability, crying, racing thoughts, and low self-esteem. (R. at 1033). He reported two prior suicide attempts, but he did not have any current suicidal ideations and was deemed not a risk of harm to himself. (R. at 1033, 1048). He stated his first suicide attempt involved swallowing chlorine, but also stated he was twice hospitalized for attempted drug overdoses. (R. at 1033, 1046). Plaintiff continued to report a diagnosis of lung cancer and chemotherapy. (R. at 1033). Plaintiff also reported he cared for his own nutritional and hygiene needs, cooked, drove, cleaned, shopped, and handled his own finances. (R. at 1038). The intake evaluator noted Plaintiff acted and dressed appropriately, he was oriented to time and place and had an intact recent and remote memory. (R. at 1043). Plaintiff was again discharged from North Central in March 2016 due to failure to comply with the treatment plan. (R. at 1060-63). Plaintiff returned for services in July 2016; he reported similar symptoms and the intake evaluator made similar findings to those noted in the November 2015 intake. (R. at 1064-87).

Since 2014, Dr. Jason G. Chamberlin, a medical doctor practicing with Graham Medical Group, has served as Plaintiff's primary care physician. (R. at Exs. 19F, 27F). Throughout that time, Dr. Chamberlin observed Plaintiff to be well-developed and well-nourished. (R. at 665, 668, 797, 1108, 1125). His heart and lungs were functioning normally. (R. at 665, 668, 797). During 2015 and 2016, Plaintiff also saw Nancy J. Crouse, a certified nurse practitioner at Graham Medical Group. Ms. Crouse likewise consistently observed Plaintiff to be alert, oriented, and well-nourished and hydrated and noted normal heart and lung functioning. (R. at 1104, 1111, 1117, 1122). Plaintiff's oxygen levels consistently sat between 96% and 99% between 2014 and 2016, as observed by both Dr. Chamberlin and Ms. Crouse. (R. at 665, 668, 797, 1104, 1108, 1110, 1117, 1120).

The record also contains treatment notes from Plaintiff's pulmonologist, Dr. Jon C. Michel, dating back to May 2014. During the initial consultation, Plaintiff's chief concern was shortness of breath, though he also reported CAD and bipolar disorder. (R. at 653). Plaintiff reported he could walk around a block before he became short of breath. (R. at 653). Plaintiff reported he smokes two packs of cigarettes per day, and Dr. Michel prescribed medication to help him quit smoking. (R. at 653). Dr. Michel noted normal heart and lung functioning but also noted interstitial markings on Plaintiff's lungs. (R. at 654). Dr. Michel ordered echocardiogram, an HRCT (high-resolution computed tomography) test, and a PSG (polysomnography) test. (R. at 655).

The echocardiogram was performed in June 2014 and came back within normal limits. (R. at 911; 679-81). The HRCT revealed no lung nodules or abnormalities but

noted some air trapping. (R. at 908; 981-83). The report specifically stated: "No abnormality is demonstrated to explain patient's symptoms." (R. at 908). The report further stated: "No interstitial lung disease is evident." (R. at 682; *see also* 688). Further testing revealed an oxygen level of 99% when resting and 93% when walking, and a pulse at 76 when resting and 103 when walking. (R. at 910).

Plaintiff saw Dr. Michel again in November 2015 and reported the same symptoms, but stated he was then smoking one pack of cigarettes per day. (R. at 904). Dr. Michel again noted normal cardiac and lung functioning and interstitial markings. (R. at 905). Dr. Michel diagnosed interstitial lung disease (ILD) and prescribed Symbicort. (R. at 905-06). Dr. Michel also ordered a CT scan to examine a potential lung nodule noted in a September 2015 CT scan. (R. at 906, 1135). The appointment concluded with a discussion about smoking cessation. (R. at 906). The CT scan ordered by Dr. Michel indicated scattered areas of gas trapping but no interstitial thickening and no nodules. (R. at 1134). The scan report suggested chronic small airway disease, possibly due to smoking or chronic asthma. (R. at 1134).

Plaintiff saw Dr. Michel again in February 2016. At this appointment, Dr. Michel prescribed Spirvia and a nebulizer to treat Plaintiff's shortness of breath and COPD. (R. at 893, 899). Plaintiff continued to report he could walk around a block before experiencing shortness of breath and he continued to smoke one pack of cigarettes per day. (R. at 896). Dr. Michel noted normal cardiac and lung functioning but ordered another HRCT and echocardiogram. (R. at 899). The record does not appear to contain the any subsequent treatment notes from Dr. Michel.

The record does contain April 2015 and June 2016 CT scans of Plaintiff's chest, which revealed no lung nodules or abnormalities. The June 2016 scan report expressed doubt as to whether the abnormality noted in the September 2015 CT scan was actually a lung nodule, suggesting it was instead a "summation artifact" as suspected in the report for the September 2015 scan. (R. at 1129, 1135).

Finally, the record also contains a questionnaire completed by Dr. Michel in November 2016 entitled "Pulmonary Disorder Report". (R. at 1094). In this questionnaire, Dr. Michel stated he began treating Plaintiff in 2014 and noted diagnoses of COPD and ILD. (R. at 1094). The questionnaire noted multiple symptoms including shortness of breath, chest tightness, wheezing, asthma, acute bronchitis, episodic pneumonia, fatigue, palpitations, and coughing. (R. at 1094).

Dr. Michel opined Plaintiff's asthma attacks, which are severe and occur approximately twice a year, are precipitated by upper respiratory infection, allergens, emotional stress, and irritants. (R. at 1094-95). Dr. Michel stated Plaintiff's fatigue and pain often impact his concentration and attention and his ability to handle stress was moderately limited. (R. at 1095). Dr. Michel indicated Plaintiff may need to lie down at unpredictable intervals if he returned to work and he would be absent from work approximately three times per month because of his conditions. (R. at 1095). Dr. Michel opined Plaintiff could walk less than a block before needing rest or experiencing severe pain and Plaintiff could only sit or stand for thirty-minute intervals before needing to change positions. (R. at 1095). During an average eight-hour work day, Dr. Michel opined Plaintiff could sit for at least six hours but could

not stand or walk for any of the listed options.[4] (R. at 1096). Dr. Michel opined Plaintiff could perform work within the sedentary work category listed in 20 C.F.R. § 404.1567(a), in that Plaintiff could occasionally lift 10 pounds and could occasionally twist and stoop, rarely crouch and climb ladders, but never climb stairs. (R. at 1096). Dr. Michel suggested Plaintiff avoid exposure to a number of environmental irritants, particularly cigarette smoke and high humidity. (R. at 1096). Finally, Dr. Michel noted a "severe PFT[5] finding in 2014." (R. at 1096).

## LEGAL STANDARDS

### I. Disability Standard

To qualify for disability benefits under the Social Security Act, a claimant must prove he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). The impairment must be of a sort that "has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). With respect to a claim for a period of disability and disability insurance benefits, a claimant must also demonstrate his or her earnings record has acquired sufficient quarters of coverage to accrue disability insurance benefits and the alleged disability began on or before the date that insurance coverage ended. 42 U.S.C. §§ 416(i)(3), 423(c)(1)(B).

---

[4] The listed options include less than two hours, about two hours, about four hours, and at least six hours. (R. at 1096).

[5] PFT stands for "pulmonary function test"; and the Court presumes Dr. Michel is referring to the test results from the March 2014 pulmonary function study that revealed a moderately severe restrictive pulmonary defect (R. at 692).

Upon receiving a claim for disability benefits under the Social Security Act, the Commissioner assesses the claimant's ability to engage in substantial gainful activity. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980). In making that assessment, the Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled and therefore entitled to disability benefits. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1); *Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

At the first step, the Commissioner makes a threshold determination as to whether the claimant is presently involved in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not, the Commissioner proceeds to the next step. *Id*. At the second step, the Commissioner evaluates the severity and duration of the claimant's impairment(s). 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has an impairment that significantly limits his or her physical or mental ability to do basic work activities, the Commissioner will proceed to the third step. 20 C.F.R. § 404.1520(c). However, if the claimant's impairments, considered in combination, are not severe, he or she is not disabled and the inquiry ends. *Id*. At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; if the elements of one of the listings are met or equaled, the claimant is eligible for disability benefits and the inquiry ends. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Fed. Appx. 1. If the claimant does not qualify under one of the listings, the Commissioner proceeds to the fourth and fifth steps after determining the claimant's RFC. 20 C.F.R. § 404.1520(e). At the fourth step, the claimant's RFC is evaluated to determine whether he or she can pursue any past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv).

If not, the Commissioner evaluates at step five the claimant's ability to perform other work available in the economy, again using the RFC. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant bears the burdens of production and persuasion at the first four steps of the Commissioner's analysis. *McNeil*, 614 F.2d at 145. However, once the claimant demonstrates an inability to perform any past relevant work, the burden shifts to the Commissioner to show an ability to engage in another type of gainful employment. *Id.* (citing *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 861 (7th Cir. 1978)).

## II.    Standard of Review

When a claimant seeks judicial review of an ALJ's decision denying disability benefits, the Court must "determine whether it was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The Court's review is governed by 42 U.S.C. § 405(g), which states: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is defined as " 'such evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Maggard*, 167 F.3d at 379 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In a substantial-evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The ALJ must "build an accurate and logical bridge from the evidence to [her] conclusion" but need not address every piece of evidence. *Clifford*, 227 F.3d at 872. The Court will remand

the case only where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Additionally, credibility determinations by the ALJ are not upset "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

DISCUSSION

Plaintiff raises several issues in his Memorandum in Support of his Motion for Summary Judgement (Doc. 11). The Court will address each in turn.

## I.     The ALJ Did Not Err at Step Three

Plaintiff's first argument appears to allege the ALJ improperly analyzed his bipolar disorder at step three, which resulted in an erroneous RFC determination. (*See* Doc. 11 at 7-9). This argument is fundamentally flawed. As the Acting Commissioner points out, the step-three determination is an entirely separate analysis from that required for the RFC determination.

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF. SSR 96-8P, 1996 WL 374184 (July 2, 1996).

*See also* 20 C.F.R. § 404.1520a(d); 20 C.F.R. § 416.945. Thus, the argument that the RFC determination is flawed *because of* the step-three determination is not a valid argument. Nevertheless, the Court finds the ALJ's step-three determination is supported by substantial evidence.

In challenging the ALJ's step-thee determination, Plaintiff appears to argue the analysis was not sufficiently detailed and the ALJ did not explicitly account for certain facts in that portion of the written decision. (Doc. 11 at 7-6). However, the ALJ "is not required to provide a complete written evaluation of every piece of testimony and evidence[.]" *Rice*, 384 F.3d at 370 (internal quotation marks omitted). Moreover, the Court reads the "ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five," the Court considers "the ALJ's treatment of the record evidence in support of both [her] conclusions at steps three and five." *Id.* at 370 n.5.

Turning to the substance of Plaintiff's argument, he fails to clearly identify which of the four functional areas warranted a heightened limitation or what level of severity was appropriate; he instead merely lists each functional area along with evidence he believes relevant. Plaintiff appears to forget he bears the burden of persuasion at step three of the analysis. *See McNeil*, 614 F.2d at 145. Even so, his identification of evidence does not undermine the ALJ's decision or require a different result because the ALJ's decision was supported by substantial evidence identified in the written order.

Respecting the first functional area—the ability to understand, remember, or apply information—the ALJ determined Plaintiff had a mild limitation. (R. at 24). The facts Plaintiff points to in his memorandum do not bear on his ability to

understand, remember, or apply information, but rather bear on his ability to concentrate, which is a different functional area.[6]

The Court cannot conclude the ALJ's determination was erroneous. Relevant to this finding, the ALJ noted testing has not revealed any marked memory deficits. (R. at 27). However, the ALJ also noted Plaintiff was found to have impaired short-term memory but an intact immediate memory in March 2014. (R. at 21). The Court further notes: (1) Plaintiff's intake evaluation at Tazwood from November 2010 indicated normal memory functioning (R. at 470); (2) Plaintiff's February 2011 psychological evaluation revealed fair long-term memory and moderately impaired short-term memory and the evaluator also indicated Plaintiff gave the impression of exaggerating "a great deal" (R. at 493); and (3) the progress notes from North Central consistently indicate Plaintiff's recent and remote memory was intact between February 2014 and July 2016 (R. at Exs. 20F, 24F). This evidence supports the ALJ's finding of a mild limitation on Plaintiff's ability to remember.

Respecting the second functional area—the ability to interact with others—the ALJ rated Plaintiff moderately limited. In challenging the ALJ's decision, Plaintiff mischaracterizes the ALJ's analysis by stating the ALJ leapt to the conclusion Plaintiff was only moderately limited because he was generally stable. (Doc. 11 at 8; *see also* R. at 24). In reality, the ALJ reasoned Plaintiff's ability to interact with others was most impacted during times of symptom exacerbation, typically due to a lack of

---

[6] Plaintiff also points to his Global Assessment of Functioning (GAF) scores in the low 40s but neglects to add that he was also assessed scores in the low- to mid-50s, as noted by the ALJ. At any rate, while GAF scores may be helpful in some circumstances, they are not dispositive and are not a requisite consideration in disability determinations. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

treatment; however, when treated, Plaintiff's symptoms are not exacerbated and he is stable and, therefore, able to interact appropriately with others. (R. at 24). This analysis absolutely makes sense. (*Contra* Doc. 11 at 8). If Plaintiff's symptoms are managed by treatment and he is generally stable and consequently not symptomatic, then his symptoms cannot be said to significantly interfere with his ability to interact with others or, from a broader perspective, with his ability to work.

Plaintiff also mentions his "tendency toward social withdrawal and isolation" and his criminal record for battery and history of anger management issues, but he fails to explain how those issues warrant a heightened level of limitation. He also fails to prove the ALJ did not consider these issues, to the extent they are supported by the record.[7] Again, the ALJ is not required to provide a written analysis of each piece of evidence appearing in the record so long as the decision is supported by substantial evidence. Here, the ALJ's decision Plaintiff is moderately limited with respect to his ability to interact with others is supported by Plaintiff's mental health providers' treatment notes describing him as stable, particularly when treated with medication (*see* R. at Exs. 3F, 9F, 11F, 14F, 16F, 20F, 24F). The decision is also consistent with the agency psychological consultant's evaluation (R. at 516-17). The Court finds the decision is supported by substantial evidence.

Respecting the third functional area—the ability to concentrate, persist, or maintain pace—the ALJ assessed a moderate limitation. (R. at 24). In reaching this

---

[7] Despite reporting his criminal history at several points throughout treatment, Plaintiff never mentioned a battery conviction. (*See*, *e.g.*, R. at 491, 1064, 1070). In addition, Plaintiff fails to direct the Court's attention to any aspect of the record demonstrating he has been treated for or diagnosed with anger management issues.

conclusion, the ALJ noted Plaintiff's testimony he has difficulties concentrating as well as the medical evidence indicating an impaired short-term memory but also the evidence indicating an intact immediate memory and an ability to perform simple calculations and serial sevens. (R. at 24; *see also* Ex. 16F). The Court further notes the evidence of short-term memory issues is contradicted by consistent findings of intact short-term memory (R. at 470, Exs. 20F, 24F), as discussed above.

Plaintiff claims the ALJ's analysis is deficient because the ALJ failed to explain "why these minimal capabilities diminish the effects of Plaintiff's undisputed and well-documented limitations with concentration, persistence, and pace." (Doc. 11 at 9). However, the ALJ did explain her decision, as noted above. Perhaps Plaintiff's argument would be better taken if the ALJ had found no limitation at all, but that is not what happened here. The ALJ's job was to weigh the evidence, and that is what the ALJ did by noting evidence it found relevant to this functional area, some aggravating and some mitigating. In weighing this evidence, the ALJ clearly concluded the mitigating evidence, *i.e.*, the ability to perform simple calculations and serial sevens as well as documentation of Plaintiff's intact immediate memory, when weighed against the documented limitations warranted a finding of moderate limitation. That decision is supported by evidence in the record, as illustrated above and in the ALJ's written decision (R. at 24).

Finally, the ALJ found no evidence indicating Plaintiff was limited in his ability to adapt or manage himself, the fourth functional area. (R. at 24). To counter this finding, Plaintiff points to "his documented chronic suicide risk factors" and his reports he goes days without showering unless told to shower by his mother, his

"mother helps him shave," and he is a "single man in his forties who lives with his parents and does no household chores." (Doc. 11 at 9).

Though Plaintiff reported being hospitalized for attempted suicide, he reports this inconsistently and provides no documentation of these hospitalizations. At one point he stated he attempted suicide only once at the age of 17, but did not report any hospitalization for that attempt (R. at 932); at another, he stated he was hospitalized for attempted suicide twice, one of those times being "ten years ago", which would have been 2006 (R. at 1046, 1079); and at another time reported being hospitalized for attempted suicide in 1995 (R. at 1004). Apart from these reports by Plaintiff, the record does not contain any record or documentation of a suicide-related hospitalization or any lasting damage from his reported attempted suicide by ingesting chlorine. Additionally, though Plaintiff reported suicidal thoughts at times, he also reported no suicidal thoughts or ideations or plans and was consistently determined to be a minimal to no risk of harm to himself. (R. at 571, 584, 592-93, Ex. 24F). The Court therefore does not find the record supports Plaintiff's argument with respect to "his documented chronic suicide risk factors." In addition, Plaintiff reported to his mental health providers he largely cared for himself in that he would care for his own nutritional and medical needs, cook, drive or use public transportation, shop, etc. (R. at Ex. 24F). Plaintiff also reported he enjoys cleaning (R. at 469, 492), which contradicts his testimony he does no household chores. (R. at 331). Finally, the ALJ specifically rejected Plaintiff's reported inability to shave due to shakiness, finding no previous reports of shakiness or a side-effect of shakiness from any of Plaintiff's medications. (R. at 26). As such, the record does not support Plaintiff's arguments,

and even if it did, Plaintiff bore the burden of proving these facts to the ALJ, which he failed to do (*see* R. at 76-77).

In sum, Plaintiff has failed to persuade the Court the ALJ erred at step-three of the sequential analysis. Critically, Plaintiff utterly failed to explain how the ALJ's severity determinations were error or what level of limitation was warranted by the evidence. This was Plaintiff's burden. *See McNeil*, 614 F.2d at 145. Simply pointing to evidence allegedly not discussed in the ALJ's written decision is not sufficient because the ALJ was not required to analyze every piece of evidence in the record in her written decision. *Clifford*, 227 F.3d at 872. The Court finds the ALJ built a logical bridge between the evidence and her step-three conclusions and those conclusions were supported by substantial evidence in the record. Because the Court concludes the ALJ did not err at step three, Plaintiff's argument the RFC determination was flawed *because of* a flawed step-three analysis would fail even if it were a valid argument. The Court must nevertheless address the ALJ's RFC determination because it is also implicated by Plaintiff's next argument.

## II.   The ALJ's RFC Determination was Supported by Substantial Evidence

Plaintiff argues the ALJ's RFC determination failed to account for his mental and physical limitations in combination. However, Plaintiff's arguments the ALJ (1) improperly dismissed his subjective reports of the severity of his symptoms and (2) improperly failed to give controlling weight to the opinions of Dr. Michel, Plaintiff's treating pulmonologist, are relevant to the resolution of his RFC argument, 20 C.F.R. § 404.1545(a)(3) (directing the ALJ to assess the RFC "based on all of the relevant

medical and other evidence"). Therefore, the Court will depart from Plaintiff's organization of the issues and adjust this analysis accordingly.

A. *The ALJ improperly applied the Treating Physician Rule, but that error was harmless*

Though now repealed, the Treating Physician Rule applies to Plaintiff's claim because it was filed before March 27, 2017. *See* 20 C.F.R. § 404.1527. "Under the Treating Physician Rule, a treating physician's opinion 'regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.'" *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)); *see also* 20 C.F.R. § 404.1527(c)(2). If an ALJ does not give controlling weight to a treating physician's opinion, it must offer "good reasons" to disregard the opinion after having considered factors such as:

> "(1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty." *Brown*, 845 F.3d at 252. (citing *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010)).

*See also* 20 C.F.R. § 404.1527(c)-(d).

Here, the ALJ declined to give controlling weight to the opinions set forth in Dr. Michel's November 2016 questionnaire because the ALJ found those opinions inconsistent with Dr. Michel's own treatment notes and other medical evidence of record. (R. at 26). Specifically, Dr. Michel's treatment notes consistently "revealed normal respiratory findings with no wheezing, crackles and equal bilateral lung

expansion." (R. at 26; *see also* R. at 654, 898, 905, 907-08). In addition, Plaintiff's oxygen level consistently sat between 96% and 99% during the relevant time periods. (R. at 26, *see also* R. at 673, 910). The ALJ did note the March 2014 test revealing a moderately severe restrictive pulmonary defect but also noted Plaintiff testified the use of inhalers and nebulizer treatments helped his symptoms. (R. at 26; *see also* R. at 692-695; R. at 54). The Court further notes Dr. Michel's November 2016 questionnaire states Plaintiff *could not* walk around a block before experiencing shortness of breath but his treatment notes indicate Plaintiff consistently reported he *could* walk around a block before becoming short of breath. (*Compare* R. at 1095, *with* R. at 653, 896, 903). Additionally, Dr. Chamberlin's and Ms. Crouse's treatment notes consistently indicate normal respiratory functioning between 2014 and 2016. (R. at 665, 668, 670, 674, 677, 688, 1104, 1111, 1117, 1122).

Despite the above analysis, Plaintiff argues the ALJ "cherry picked her way through the medical records to identify the most benign findings." (Doc. 11 at 12). Plaintiff, however, fails to direct the Court's attention to any picked-over cherries. Instead, Plaintiff chose to argue: "The ALJ actually admitted to playing doctor, noting that though she considered the opinions of State agency physicians, they did not have the benefit of the entire record when they issued their opinions." (Doc. 11 at 12). This is a mischaracterization of the ALJ's statement. The ALJ simply observed the agency physicians did not have all the medical evidence appearing in the record when making the initial disability determinations. Indeed, they did not. It appears the agency physicians only had some medical records through March 2014 (*see* R. at 81-82; 93-94) for the initial determination and some medical records through March 2015

(*see* R. at 108-12; 125-29) for the decision on reconsideration. Dr. Michel's treatment

notes and documentation range from June 2014 through November 2016 (R. at 889-

912, 1095), so the agency physicians could have only considered Dr. Michel's records

on reconsideration and, even then, only part of his records. Likewise, treatment notes

from Dr. Chamberlin and Ms. Crouse, as well as North Central for that matter, range

from 2014 through 2016. (*See* R. at Exs. 19F, 20F, 24F, 27F). The ALJ's observation

of this fact is not an admission to "playing doctor" but was instead notice of a highly

relevant factor in the ALJ's consideration of those opinions.

It is not this Court's function to reevaluate the evidence in reviewing the ALJ's

decision; rather, it this Court's function is to consider whether the ALJ's decision is

supported by substantial evidence. 42 U.S.C. § 405(g). As previously explained,

substantial evidence is defined as "more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

The Court finds the evidence discussed above constitutes substantial evidence

supporting the ALJ's decision to not give controlling weight to the opinions expressed

in Dr. Michel's November 2016 questionnaire.

However, the Court finds the ALJ's consideration of the requisite regulatory

factors set forth in 20 C.F.R. § 404.1527(c) inadequate.[8] The ALJ failed to explicitly

identify any of the regulatory factors, so the Court must now consider whether the

ALJ's analysis implicitly accounted for those factors. *See Hall v. Berryhill*, No. 16-C-

---

[8] The ALJ also failed to explicitly state what weight she afforded Dr. Michel's opinions
but did state they were "not afforded significant weight." The Court takes this
statement to mean the ALJ afforded Dr. Michel's opinions "little weight."

938, 2017 WL 4564244, at *6 (N.D. Ill. June 21, 2017), *aff'd*, No. 17-2628, 2018 WL 4959710 (7th Cir. Oct. 15, 2018).

The ALJ did explicitly conclude Dr. Michel's opinions were inconsistent with the medical evidence of record, *see* 20 C.F.R. § 404.1527(c)(3)-(4), but the ALJ did not appear to consider the length, nature, or extent of the treatment relationship between Plaintiff and Dr. Michel; the frequency of Dr. Michel's examinations; Dr. Michel's specialty; or the types of tests Dr. Michel performed or ordered, *see id.* §§ 404.1527(c)(1)-(2), (5). Dr. Michel, a pulmonologist, has treated Plaintiff since 2014 for diagnoses of COPD and ILD, both disorders of the lung falling within Dr. Michel's specialty. (R. at 1094) The record contains treatment notes from appointments in May 2014, June 2014, November 2015, and February 2016. (R. at Exs. 17F, 22F). During the initial consultation, Dr. Michel ordered, *inter alia*, an HRCT scan and an echocardiogram, and Dr. Michel ordered subsequent CT scans of Plaintiff's chest. These factors weigh in favor of affording Dr. Michel's medical opinions more than "little weight," as they establish a treatment relationship spanning over the course of two years and extensive medical testing, though it does not appear that Dr. Michel saw Plaintiff more than once or twice per year. *See Hall*, 2017 WL 4564244, at *6.

Notwithstanding, the Court finds substantial evidence in the record supports the ALJ's decision to significantly discount Dr. Michel's opinion. In addition to the inconsistencies previously discussed, the medical testing in the record revealed results inconsistent with Dr. Michel's opinion on Plaintiff's limitations. A June 2014 echocardiogram showed normal lung functioning with no abnormalities and a CT scan report stated: "No abnormality is demonstrated to explain patient's symptoms."

(*See* R. at 682-83, 908). The record also contains results from a February 2014 chest x-ray, wherein the physician noted "multiple previous chest radiographs dating [back] to 12/20/2011" and "[n]o significant changes from previous studies[,]"which seemingly revealed normal lung functioning and no acute abnormalities. (R. at 688). Furthermore, though Dr. Chamberlin's treatment notes indicate a lung nodule, nearly all scans revealed no lung nodules or abnormalities and the only scan report indicating the presence of a *possible* lung nodule indicated it might be "summation artifact," an opinion repeated in subsequent testing. (R. at 1129, 1135). These results, which largely indicate normal lung functioning, lend credence to the ALJ's determination Dr. Michel's opinions overstate and overcompensate for Plaintiff's true condition and limitations.

For these reasons, the Court finds substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Michel's opinions, and the ALJ's failure to properly consider the requisite regulatory factors in rejecting those opinions was therefore harmless error. *See Hall*, 2017 WL 4564244, at *6 (citing *Schomas v. Colvin*, 732 F.3d 702, 707–8 (7th Cir. 2013) ("But this kind of error is subject to harmless-error review, and we will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same.")).

B.     *The ALJ did not err in weighing Plaintiff's testimony*

Plaintiff next argues the ALJ engaged in a "gratuitous attack" on his credibility in violation of SSR 16-3P, 2016 WL 1119029 (Mar. 16, 2016). (Doc. 11 at 13). Instead of analyzing the ALJ's decision under the framework set forth in SSR 16-3P, Plaintiff merely states: "It is difficult to evaluate the reasons for the ALJ's rejection of

Plaintiff's allegations because, quite simply, she did not offer any. All she did, essentially, was summarily dismiss his statements regarding his 'need for restriction' in a brief paragraph." (Doc. 11 at 13).

As the Acting Commissioner notes in her memorandum (Doc. 15 at 11), SSR 16-3P and the relevant regulations direct ALJs to, rather than focus on the claimant's credibility, focus first on "whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce an individual's symptoms" and then evaluate "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." SSR 16-3P at *2-4; *see also* 20 C.F.R. §§ 404.1529, 416.929; *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). "So long as an ALJ gives specific reasons supported by the record," the Court will not overturn an ALJ's SSR 16-3P assessment unless it is "patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (citation omitted). The Seventh Circuit has noted this is an "extremely deferential" standard. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013).

Contrary to Plaintiff's undeveloped and misguided argument, the ALJ adequately articulated her basis for discounting his statements relating to the persistence and intensity of his symptoms. Upon concluding Plaintiff's impairments could reasonably be expected to produce symptoms (R. at 26), the ALJ reasoned:

> In assessing the claimant's residual functional capacity, the undersigned has considered the claimant's complaints of pain and functional limitations, but do[es] not find them consistent with the medical evidence and other evidence of record. . . .
> . . .
> The claimant testified to somewhat limited activities, but the record does not support the need for such restriction. He testified that he spends his time watching television and goes to visit his sister who

lives next door. He lives with his mother, and said that she performs all household chores. He is able to shower, but says his mother helps him shave because he gets 'shaky.' The undersigned notes there is no evidence of such complaints or findings of shakiness upon examination. . . . The medical evidence reveals no evidence of any significant side effects [from his current medications] were reported.
. . .

The claimant's allegations at the hearing of disabling limitations due to shortness of breath, chest pain, joint pain and extremity swelling along with bipolar symptoms, are not supported by the evidence of record, including the claimant's failure to follow prescribed treatment at times, failing to attend scheduled appointments at North Central and Tazwood. . .

The Claimant alleges that he is unable to work because he cries often and cannot remember things, but testing has not revealed marked memory deficits. Furthermore, progress notes from all his providers have revealed overall that his mental status has been mostly stable, other than his own subjective reports or complaints. (R. 26-27).

This analysis tracks the two-step framework set forth in SSR 16-3P and the regulations. With respect to the alleged memory issues and "crying spells", the only symptoms Plaintiff mentions in his argument (Doc. 11 at 13), the ALJ specifically noted objective testing did not reveal marked memory deficits and the progress notes described Plaintiff's mental status as mostly stable. (R. at 24, 27; *see also* R. at 761). In addition, the ALJ found significant the fact that Plaintiff continued smoking in excess of one pack of cigarettes per day at least through February 2014 despite his reports of disabling lung conditions. (R. at 27; *see also* R. at 664, 667, 672, 676, 896, 903, 906).

The ALJ's analysis is sufficient to comply with SSR 16-3P because it demonstrates how Plaintiff's testimony is inconsistent with the objective evidence of record; it is not a "gratuitous attack on Plaintiff's credibility." *See, e.g., Hall*, 2017 WL 4564244 at *7 ("ALJ's finding of minor inconsistencies in claimant's testimony as well as general inconsistency with the overall objective evidence was sufficient to establish

her SSR 16-3p determination was not patently wrong." (citing *Stehlin v. Berryhill*. No. 16-C-3455, 2017 WL 2408127, at *8–9 (N.D. Ill. June 2, 2017))). Because Plaintiff's subjective complaints and testimony at the hearing are inconsistent with the objective evidence of record—a fact noted by several professionals in the record— the ALJ was permitted to discount Plaintiff's statements and rely instead on the objective evidence in "determining the extent to which the symptoms limit [Plaintiff's] ability to perform work-related activities." *See* SSR 16-3P at *8; 20 C.F.R. §§ 404.1529(c)(4). The Court therefore rejects Plaintiff's argument and finds the ALJ's SSR 16-3P analysis sufficient and not "patently wrong".

Plaintiff apparently does not contest the ALJ's assessment of his other statements relating to the severity of his symptoms, as he provides no analysis beyond cursorily challenging the ALJ's analysis of his reported "crying spells" and memory issues. He has therefore waived any such argument. Regardless, the Court finds the ALJ's SSR 16-3P analysis adequate for the reasons discussed above.

C.    *The ALJ's RFC determination was supported by substantial evidence*

Having addressed the ALJ's determinations of the weight to be afforded to Dr. Michel's opinions and Plaintiff's testimony and subjective reports, the Court now turns to the ALJ's RFC determination.

A claimant's RFC is the most the claimant can do in light of his or her mental and/or physical limitations. 20 C.F.R. § 404.1545(a)(1). To determine a claimant's RFC, the ALJ must consider the record as a whole and will evaluate the claimant's reported symptoms "in relation to the objective medical evidence and other evidence[.]" *Id.* § 404.1545(a)(3); *see also* § 404.1529(c). The ALJ also considers the

limiting effects of all the claimant's impairments, even nonsevere impairments. §

404.1529(e). Critically, the Court's function is to consider whether substantial

evidence supports the ALJ's RFC determination; this standard of review "allows

reasonable minds to differ", *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001),

and the Court will not disturb the ALJ's determination so long as it is supported by

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion", *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

Here, the ALJ concluded Plaintiff could perform medium work as defined in 20

C.F.R. § 404.1567(c), which "involves lifting no more than 50 pounds at a time with

frequent lifting or carrying of objects weighing up to 25 pounds." (R. at 25). To further

compensate for Plaintiff's pulmonary conditions, the ALJ restricted Plaintiff to work

that avoids "concentrated exposure to fumes, odors, dusts, gases, poor ventilation,

and temperature extremes." (R. at 25). With respect to Plaintiff's bipolar disorder and

other nonexertional limitations, the ALJ restricted Plaintiff to work involving

"simple, routine, repetitive tasks that can be easily resumed if [Plaintiff] is

momentarily distracted" and "occasional interaction with coworkers and supervisors

of a brief and superficial nature with no interaction with the public." (R. at 25).

To reach this determination, the ALJ stated it considered Plaintiff's testimony

and reported symptoms, including his daily activities and reported shakiness, which

allegedly necessitated help from his mother when shaving. (R. at 26). The ALJ also

considered Dr. Michel's treatment notes and November 2016 questionnaire,

pulmonary functioning tests and x-ray results, Plaintiff's medications, treatment

notes from Plaintiff's mental health providers, and the opinions of the agency

physicians and consultants. (R. at 26-27). As explained in subsections II(A) and II(B) *supra*, the ALJ explained why controlling weight was not given to Dr. Michel's opinions and why Plaintiff's testimony and subjective reports of his symptoms were inconsistent with the evidence of record; specifically, both were inconsistent with Dr. Michel's own treatment notes and other objective medical evidence of record. The Court finds the ALJ's discussion of the evidence demonstrates the ALJ considered the record as a whole when assessing Plaintiff's RFC.

In his memorandum, Plaintiff argues a February 2014 x-ray revealing a possible lung nodule,[9] a March 2014 test revealing a moderately restrictive pulmonary defect, and his doctor's recommendation that he not lift more than five to ten pounds undermine the ALJ's RFC determination. (Doc. 11 at 10-11). Plaintiff also relies heavily on the opinions stated in Dr. Michel's November 2016 questionnaire. (Doc. 11 at 10-11). However, the ALJ expressly considered all this evidence and analyzed it in the written decision. The ALJ noted a possible lung nodule was revealed in an x-ray and it was being monitored (R. at 26). Moreover, the ALJ noted Plaintiff testified the use of inhalers and nebulizers helped his moderately restrictive pulmonary defect and the treatment notes consistently revealed normal lung functioning. (R. at 26). With respect to the lifting limitations, Plaintiff merely points to his own testimony and does not indicate what doctor suggested this limitation or when this limitation was suggested; the Court has found no such recommendation in

---

[9] Notably, the February 2014 chest scan revealed no abnormalities or lung nodules. (R. at 688). A possible lung nodule was noted in September 2015 but was thought to actually be a "summation artifact"; scans before and after September 2015 revealed no lung nodules. (R. at 1129, 1135).

any treatment notes in the record. In light of the fact Plaintiff's reports are largely inconsistent with the evidence of record, the Court is not persuaded by this argument. Finally, the ALJ *did* consider the opinions expressed in Dr. Michel's November 2016 questionnaire, but the ALJ also explained why Dr. Michel's opinion was not given significant weight (R. at 26), as discussed in subsection II(A), *supra*. So, it is no surprise the ALJ's RFC determination does not defer to the opinions expressed in the questionnaire, and Plaintiff's argument the RFC determination is therefore incorrect is unavailing.

Plaintiff also complains the ALJ only accommodated environmental irritants in the RFC determination. (Doc. 11 at 11). This is untrue. As stated, the ALJ also restricted Plaintiff to "simple, routine, repetitive tasks that can be easily resumed if [Plaintiff] is momentarily distracted" and to "occasional interaction with coworkers and supervisors of a brief and superficial nature with no interaction with the public." (R. at 25). These further restrictions were meant to account for Plaintiff's bipolar disorder and other nonexertional limitations, *i.e.*, his limited ability to concentrate, persist, or maintain pace and his limited ability to interact well with others due to that disorder, which, notably, are the only two functional areas within which the ALJ determined Plaintiff was moderately limited. Plaintiff seemingly believes his RFC should contain more nonexertional restrictions to compensate for the limitations arising from his bipolar disorder, but much like his failure to explain how the ALJ's step-three determination was error, Plaintiff fails to explain how these specific restrictions are insufficient or what further restrictions were warranted. (Doc. 11 at 9). Again, this was Plaintiff's burden. *McNeil*, 614 F.2d at 145.

In effect, Plaintiff's arguments boil down to a request that this Court reweigh the evidence already considered by the ALJ and reach different conclusions. However, that is not the Court's function, particularly when the ALJ explained why the disputed evidence was inconsistent with or undermined by other objective evidence of record (R. at 25-27). As explained in this subsection and in subsections II(A) and II(B) *supra*, the ALJ supported its RFC analysis with evidence in the record, and the written decision indicates the ALJ considered the record as a whole. Moreover, the ALJ's RFC determination is consistent with the recommendations from the agency physicians and psychological consultants. (R. at 86-88; 98-100; 116-20; 133-37; 516-17). The Court finds the ALJ's RFC determination is supported by substantial evidence and cannot conclude the RFC determination is so unreasonable that no reasonable mind could reach the same conclusion. *See Craft*, 539 F.3d at 673.

## III.    The ALJ Did Not Err by Relying on the Vocational Expert's Testimony

Finally, Plaintiff argues the ALJ committed error by relying on the VE's testimony. (Doc. 11 at 13-14). As the Acting Commissioner observes, Plaintiff's arguments are vague. It would appear Plaintiff asserts the VE did not tailor its estimation of available jobs to the region in which Plaintiff resides. (Doc. 11 at 14). Plaintiff also seems to argue the VE's testimony is unreliable because it relies, at least in part, on the Dictionary of Occupational Titles (DOT), which Plaintiff maintains is obsolete. (Doc. 11 at 13-14). The Court rejects these arguments.

To the extent Plaintiff's first argument is solely the estimates were based on the number of jobs available in the "entire United States" as opposed to the parameters set forth in 20 C.F.R. § 404.1566, the argument is forfeited due to

Plaintiff's failure to raise that issue at the hearing. *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016) (concluding the plaintiff forfeited challenges to the VE's testimony because the plaintiff failed to object to the testimony at the hearing).

Even so, the argument is unsupported by the record. Plaintiff states the "ALJ failed to seek or provide numbers regarding the availability of jobs in the 'national economy' which is defined as the region where the individual resides or in several regions of the country." (Doc. 11 at 14). The VE specifically testified his estimates were of jobs available in the "national economy" *and* "similar numbers of jobs exist in various regions of the country." (R. at 73). Plaintiff's unfounded speculation that the estimates provided were based on the number of jobs available in the "entire United States" as opposed to the parameters set forth in 20 C.F.R. § 404.1566 are unpersuasive in light of the VE's express testimony to the contrary.

In addition, counsel for Plaintiff asked the VE to explain on cross-examination the basis for his estimations. (R. at 75). The VE explained he arrived at his estimations by cross-checking the quarterly reports from the Bureau of Labor Statistics with a program called "Job Browser Pro." (R. at 75). He then compared those statistics against the labor markets he's observed over the years, checking local areas to ensure the statistics are comparable. (R. at 75). Counsel for Plaintiff, apparently satisfied with these answers, did not ask any further questions or inquire whether the estimates were based on the number of jobs available in the "entire United States." (R. at 75). Based on the record and Plaintiff's undeveloped argument, the Court cannot conclude the VE failed to provide—or the ALJ failed to consider—

whether Plaintiff is able to perform jobs existing in significant numbers in the national economy as required by 20 C.F.R. § 404.1566.

Plaintiff's remaining argument is likewise forfeited because he did not challenge the VE's reference to the DOT at the hearing. (*See* R. at 71-75). The ALJ was required by regulation to take notice of the DOT, regardless of whether Plaintiff believes it is unreliable. 20 C.F.R. § 404.1566. It was Plaintiff's duty to object to the VE's testimony on direct examination and/or probe any perceived deficiencies in the testimony on cross-examination. *See* SSR 00-4P, 2000 WL 1898704 (Dec. 4, 2000) (noting an objection to the basis for the VE's testimony *triggers* the ALJ's duty to inquire into that basis). Plaintiff did not. He therefore forfeited any argument with respect to the VE's reference to or reliance on the DOT. *See Brown*, F.3d at 254.

That being said, the Court is cognizant of the Seventh Circuit's criticisms of the DOT in recent years, which are noted in Plaintiff's memorandum (Doc. 11). *See Voight v. Colvin*, 781 F.3d 871 (7th Cir. 2015); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). The Northern District's comment on this quandary is enlightening:

> The Court shares [the plaintiff's] concerns on this topic. However, neither *Voight* nor *Browning* was specifically decided on the issue that Plaintiff raises here. *See Fitzgerald v. Colvin*, 2016 WL 447507, at *11 (W.D. Wis. Feb. 4, 2016) (calling the Seventh Circuit's language dicta and noting that the court did not find "that the [ALJ] erred in relying on the [vocational expert's] unexplained vocational testimony and did not overrule well-established precedent allowing [ALJs] to do so"). Lower courts have reached mixed results on the topic. *See Khuzaie v. Comm. of Soc. Sec.*, 2016 WL 1253537, at *11 (N.D. Ind. March 30, 2016); *Kordeck v. Colvin*, 2016 WL 675814, at *9 (N.D. Ind. Feb. 19, 2016) (recommending that the ALJ obtain updated job data but remanding on other grounds); *Brown v. Colvin*, 2015 WL 7294547, at *7 (W.D. Wis. Nov. 17, 2015) (stating that the Seventh Circuit "has not yet overturned an administrative law judge's denial of an appeal on that basis alone"). *But see Rinderer v. Colvin*, 2015 WL 3636389, at *8 (S.D. Ill. June 11, 2015) (remanding on this issue because the claimant was

unrepresented). *Goo v. Colvin*, No. 15-C-5858, 2016 WL 3520191, at *10 (N.D. Ill. June 28, 2016).

*See also Kohlhaas v. Berryhill*, No. 17-CV-413, 2018 WL 1090311, at *4 (S.D. Ill. Feb. 28, 2018) (concluding the Seventh Circuit's criticism of the DOT in *Browning* and *Voight* was dicta). The Court agrees with the Northern and Southern Districts of Illinois and concludes neither *Browning* nor *Voight* require remand for the sole reason the DOT is outdated and contains potentially obsolete information. Indeed, the Seventh Circuit's criticism of the DOT does not equate a mandatory finding of reversible error whenever an ALJ relies on VE testimony referencing the DOT, particularly when the ALJ is *required* by regulation to take notice of the information contained in the DOT.

Notwithstanding, as in *Goo*, the Court is troubled by the fact the Acting Commissioner failed to address either *Browning* or *Voight*, both of which were cited by Plaintiff. "The Seventh Circuit has repeatedly expressed its serious concerns over this issue. The government must begin addressing *Browning*, *Voight*, and other Seventh Circuit rulings head on. It could start (unlike here) by citing them and explaining why they do not require remand." *Goo*, No. 15-C-5858, 2016 WL 3520191, at *10 (N.D. Ill. June 28, 2016).

## CONCLUSION

After careful review of the entire record, the Court concludes the ALJ's decision is supported by substantial evidence. The Court therefore DENIES Plaintiff's Motion for Summary Judgment (Doc. 10) and GRANTS Defendant's Motion for Summary Affirmance (Doc. 14). This case is TERMINATED.

SO ORDERED.

Entered this 29th day of November 2018.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
